## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| Plaintiffs Crystal Johnson, Nancy Kebort, Karen Langston, Pamela Sheehan-Peterson, and Leslie Ann Williams, *individually and on behalf of all others similarly situated*,<br><br>            Plaintiffs,<br><br>      v.<br><br>Paparazzi, LLC,<br><br>            Defendant. | **DEMAND FOR JURY TRIAL**<br><br>**CLASS ACTION COMPLAINT** |

## CLASS ACTION COMPLAINT

Plaintiffs Crystal Johnson, Nancy Kebort, Karen Langston, Pamela Sheehan-Peterson, Leslie Ann Williams, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Paparazzi, LLC ("Defendant" or "Paparazzi") for its breaches of warranties, deceptive acts and practices, and negligent representations related to its products, which Paparazzi falsely represented as being lead and nickel free. Plaintiffs allege the following based on personal knowledge as to themselves, and as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## <u>NATURE OF THE CASE</u>

1.    Plaintiffs bring this class action on behalf of themselves, and a class of persons who purchased Paparazzi's necklaces, earrings, bracelets, and other accessories ("Products"), which Plaintiffs' testing has revealed contain lead and nickel, in contradiction to Paparazzi's express claims that its Products were lead and nickel free.

2.    A central tenet of Paparazzi's marketing and sales strategy during the relevant time period was to prominently promote its Products as lead and nickel free.

3.    Paparazzi's marketing appeals were conspicuously saturated with such claims:








  

4.      In stark contrast to Paparazzi's pervasive marketing of its Products as lead and nickel free, Plaintiffs' independent testing, as well as test results obtained from other customers, has revealed that Paparazzi's Products do in fact contain significant amounts of lead and nickel.

5.      Consumers lack the ability to ascertain the true contents of Paparazzi's Products prior to purchase. Accordingly, reasonable consumers must and do rely on Paparazzi to accurately and honestly disclose the materials in its Products. This is especially true for materials such as lead and nickel.

6.      Paparazzi made its "lead and nickel free" claims a central part of its marketing message to consumers in order to misleadingly create the impression that its Products are safer and of a higher level of quality than they are in reality.

7.      In late 2021 or early 2022, Paparazzi customers began to conduct laboratory testing of the Products and discovered that Paparazzi's "lead and nickel free" claims were untrue. After reports of these tests results were made

publicly available, Paparazzi stopped representing that its Products are lead and nickel free.

8.    As a direct result of Paparazzi's pervasive marketing campaign, customers reasonably relied and continue to rely on Paparazzi's widespread express false statements, misleading representations and material omissions and expected that its Products would be free of lead and nickel and, therefore, they mistakenly believed they would not be exposed to the adverse effects associated with these materials.

9.    Defendant's false statements, misrepresentations and material omissions about the presence of lead and nickel contained in its Products are intentional and designed to induce consumers to purchase its Products.

10.    If Defendant Paparazzi disclosed to consumers, including Plaintiffs and proposed Class Members, that its Products contained lead and nickel, these consumers would not have purchased the Products at all, or they would not have paid the price they did.

11.    By making these false statements, misrepresentations and material omissions, Paparazzi is able to distinguish itself from competitors, as well as appeal to reasonable consumers who otherwise would not buy costume jewelry, thereby increasing Paparazzi's sales and profits.

12.    Paparazzi consumers were told to "feel glamorous, not guilty" because Paparazzi's Products were lead and nickel free:



13.    Customers reasonably relied on and believed Paparazzi's false statements. In addition to purchasing the Products for their personal use, customers, including Plaintiffs, purchased and gave the Products as gifts to children, family and friends. Now, confronted with the truth about Paparazzi's Products, that they indeed contain lead and nickel, these customers now feel guilty about exposing their loved ones to the risk of suffering the adverse effects associated with these materials.

14.    As a result of Defendant Paparazzi's misconduct, false statements, misrepresentations and material omissions, Plaintiffs and proposed Class Members have suffered injury in fact, including economic damages.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) and 1367 because this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest

and costs, and in which some Members of the proposed Class are citizens of a state different from Defendant's state.

16.    This Court has personal jurisdiction over Defendant because it transacts business in the United States, including in this District, has substantial aggregate contacts with the United States, including in this District, engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and purposely availed themselves of the laws of the United States and the State of North Carolina, and further, because Plaintiffs live and purchased the Products in the State of North Carolina.

17.    In accordance with 28 U.S.C. § 1391, venue is proper in this District because this District is where a substantial part of the conduct giving rise to Plaintiffs' claims occurred, where Defendant transacts business, and where Plaintiffs purchased the Products.

## PARTIES

18.    Plaintiff Crystal Johnson is a citizen of North Carolina residing in Fayetteville, North Carolina.

19.    Plaintiff Nancy Kebort is a citizen of North Carolina residing in Fayetteville, North Carolina.

20.    Plaintiff Karen Langston is a citizen of North Carolina residing in Fayetteville, North Carolina.

21.    Plaintiff Pamela Sheehan-Peterson is a citizen of North Carolina residing in Fayetteville, North Carolina.

22.    Plaintiff Leslie Ann Williams is a citizen of North Carolina residing in Roseboro, North Carolina.

23.    Defendant Paparazzi LLC ("Paparazzi") is incorporated and its primary place of business is in St. George, Utah.

## FACTUAL ALLEGATIONS

### A.    Background

24.    Defendant Paparazzi designs, formulates, manufactures, markets, advertises, distributes, and sells women's and men's Products and, until about February 2022, children's Products.

25.    Paparazzi's business model is what is widely known as a multi-level marketing business, in which Paparazzi recruits salespersons to market and sell its Products to consumers for a commission. Paparazzi also claims its salespersons can earn large commissions and bonuses for recruiting other individuals to be Paparazzi salespersons.

26.    Paparazzi is the sole source of information concerning the Products, including the Products' qualities and composition.

27.    Consistent with the multi-level marketing business model, the information in Paparazzi's marketing and outreach to consumers is provided

entirely through its website, its social media presence, and through the information Paparazzi provides to its consultants.

**B.    Paparazzi's Pervasive and Prominent Marketing of its Products as Lead and Nickel Free**

28.    Until on or about December 2021, Paparazzi engaged in a pervasive marketing campaign that had a prominent and consistent message: Paparazzi sells inexpensive jewelry that is lead and nickel free.

29.    For example, Paparazzi expressly and conspicuously touted that all of its Products were lead and nickel free on its website[1]:



---

[1]http://web.archive.org/web/20161024002621/https://paparazziaccessories.com/about/

30.    Additionally, Paparazzi's consultants, who were responsible for disseminating Paparazzi's marketing, repeated Paparazzi's lead and nickel-free claim in online and in-person sales sessions, often at the beginning and then throughout the sales session.

31.    Similarly, these consultants saturated their marketing appeals on their other social media accounts and websites with the claim that Paparazzi's Products were lead and nickel free.

32.    As described in more detail below, consultants' repeated use of Paparazzi's lead and nickel free claim was a result of the brand identity created by Paparazzi, as well as its direction and encouragement to employ the "lead and nickel free" claim.

33.    Paparazzi scrubbed its website of its express claims that its Products are lead and nickel free on or about December 2021 or early 2022, just after reports began circulating online that Paparazzi's Products indeed contain lead and nickel.

34.    In an effort to allay customers' concerns about the adverse effects they may suffer from wearing its Products and mitigate the harm to its sales and reputation, Paparazzi **now** represents that "some [of its] jewelry **may contain trace amounts of lead and nickel**" and that "[t]he metals found in Paparazzi jewelry pieces are primarily made of iron and include other trace

minerals. Those trace minerals are made up of a metallic alloy of either zinc, steel, or aluminum."[2]

## C. Paparazzi Trains and Incentivizes Salespersons to Repeat "Lead and Nickel Free" Marketing Claims

i. *Paparazzi's Direction and Control of Consultants' Marketing and Sales Practices*

35.    Paparazzi directs, controls, and has the authority to control, all Paparazzi-brand marketing, which includes its consultants' marketing (which repeats Paparazzi's own marketing claims).

36.    From the very beginning, Paparazzi emphasized to its consultants that the lead and nickel-free nature of the Products was a key characteristic and selling point.

37.    For example, after signing a contract with Paparazzi, consultants must purchase a Welcome Package. The Welcome Package contains a training brochure authored by Paparazzi to educate consultants on how to sell the Products.

38.    The training brochure includes a section entitled "Quick Facts," which states that "Paparazzi products are: Lead-free and nickel-free":

---

[2] https://mailchi.mp/paparazziaccessories/a-holiday-gift-for-you-1383107?e=6c95b6359f (Last accessed March 23, 2022) (Emphasis added).



39.    Paparazzi's purpose in providing the training brochure in general, and the "Quick Facts" section specifically, is to ensure that consultants repeat Paparazzi-approved marketing claims about the Products.

40.    Paparazzi requires that consultants repeat such claims; it does not simply hope that the consultants repeat Paparazzi-approved marketing claims.

41.    Every Paparazzi consultant is governed by a formal "Policies and Procedures" document.

42.    Paparazzi explains that the purpose of its "Policies and Procedures" document is "to clearly articulate the expected behavior and acceptable business conduct of all parties involved." One such expected behavior is "to comply with [the Policies and Procedures] and its components…"

43.    As a consultant, Paparazzi provides a number of "benefits", including "the ability to hold house parties, larger parties, or promote larger shows under the Paparazzi name…" and "[t]he ability to receive Paparazzi training and communication…"

44.    However, the "benefits" offered by Paparazzi also come with expectations. In its Policies and Procedures, Paparazzi requires that "[c]onsultants must adhere to all published Paparazzi Marketing and Compensation Plan literature. Paparazzi Consultants may not offer Paparazzi products or opportunity in conjunction with any other system, program, or method of marketing other than that which is set forth in the published Paparazzi Marketing literature."

45.    In fact, Paparazzi so zealously governs how its consultants market the Products that Paparazzi institutes a pre-marketing review requirement: "Any personalized promotional material or advertising attempt must be approved by Paparazzi and its legal department to ensure that there are no claims or violations to the Paparazzi trademark, namesake, or other legal issues."

46.    The Paparazzi Marketing literature includes the training brochure and specifically Paparazzi's marketing claims that the Products are lead and nickel free.

47.    Paparazzi monitors consultants' marketing and sales practices and suspends or terminates consultants who violate Paparazzi's Policies and Procedures, including its marketing guidelines.

ii.    *Paparazzi's Business Model Ensures Marketing Plan is Followed*

48.    In addition to its Policies and Procedures, Paparazzi's business structure ensures that its lead and nickel-free marketing communication strategy is adopted and followed by its consultants.

49.    Paparazzi's business model, like other multi-level marketers, is founded on a recruit-and-sell strategy whereby a consultant who recruits other consultants will receive a portion of the

recruited-consultant's sales revenue. The more a consultant can recruit others, who can in turn recruit others, the higher the original consultant's revenue will theoretically increase.



50.    The pyramid of positions starts with the position "consultant" and continues as follows: star consultant, director, premier director, executive director, producer, premier producer, executive producer, fashionista, a-lister,

13

maven a-lister, jetsetter, luxe jetsetter, and impressionista. As a person recruits more individuals below them, who recruit more individuals below them, and so on, the higher the person's income potential.

51.    As a result, consultants are encouraged to, and do, develop "teams" of other consultants. Consultants who develop a team are able to and do communicate marketing strategies and claims, which must be consistent with Paparazzi's own marketing.

52.    Paparazzi provides bonuses based on consultants' commission earnings, which Paparazzi represents on its income disclosure form as follows:

| Bonus Rank | Percent of Consultants Earning Commissions Monthly | Highest Monthly Bonus Paid | Lowest Monthly Bonus Paid | Average Monthly Bonus Paid |
|---|---|---|---|---|
| Consultant | 4.39% | $99.00 | $0.10 | $12.38 |
| Star Consultant | 69.92% | $1,736.00 | $0.10 | $23.90 |
| Director | 18.57% | $10,134.30 | $2.25 | $186.63 |
| Premier Director | 2.88% | $18,392.40 | $174.80 | $587.33 |
| Executive Director | 1.87% | $14,878.46 | $380.06 | $989.99 |
| Producer | 1.14% | $26,911.86 | $925.60 | $2,002.65 |
| Premier Producer | 0.43% | $14,428.00 | $1,402.48 | $3,164.39 |
| Executive Producer | 0.39% | $20,935.34 | $2,164.10 | $5,066.19 |
| Fashionista | 0.20% | $41,350.57 | $4,025.40 | $9,761.86 |
| A-Lister | 0.07% | $59,236.84 | $8,293.84 | $16,219.80 |
| Maven A-Lister | 0.06% | $54,658.06 | $15,620.12 | $28,136.54 |
| Jetsetter | 0.05% | $237,151.40 | $24,471.68 | $71,918.53 |
| Luxe Jetsetter & Above | 0.01% | $237,235.54 | $103,391.23 | $161,390.29 |

53.    In order to entice consultants to move up the ladder and reach higher levels of compensation, Paparazzi lionizes its top consultants and encourages other consultants to emulate their sales practices. By elevating its top consultants, Paparazzi not only achieves higher revenue but also ensures that their marketing messages, including the lead and nickel free claim, are repeated by other consultants.

54.    Therefore, Paparazzi controls every aspect of the Products' marketing: by controlling how consultants are educated, requiring consultants to repeat Paparazzi's marketing messages, showcasing top consultants and their marketing strategies, and by structuring their business so that hierarchical "teams" develop with consistent marketing claims.

**D. Independent Testing Results Reveal Paparazzi's Products Contain Lead and Nickel.**

55.    In or about December 2021, former Paparazzi consultants grew to be suspicious of Paparazzi's claims that its products were lead and nickel free. These consultants believed that Paparazzi's jewelry may contain lead and nickel despite Paparazzi's consistent representations to the contrary.

56.    These former consultants commissioned a third-party testing facility, Waypoint Analytical, to lab test (10) pieces of metallic jewelry manufactured and distributed by Paparazzi to determine their composition.

57.    The result of the lab testing arranged by these former consultants was released on or around January 2022, and confirmed that each piece of

Paparazzi jewelry that was tested contained lead and nickel, along with other materials known to be hazardous, including arsenic and cadmium.[3]

58.    In addition, Plaintiffs sought independent third-party testing to determine whether Paparazzi's Products contained lead and/or nickel.

59.    Plaintiffs' independent testing was conducted in accordance with accepted industry standards for detecting whether jewelry products contain lead or nickel.

60.    Here, Plaintiffs' testing revealed that every Paparazzi Product tested contained significant amounts of lead or nickel that exceed trace levels.

## E. Defendant's False Statements and Misrepresentations are Material

61.    Paparazzi's representations that its Products were lead and nickel free are material because they would likely affect consumers' decision to purchase these products and did in fact affect Plaintiffs' and proposed Class Members' purchase decisions.

62.    Paparazzi made its express lead and nickel free claims a central part of its marketing message to consumers in order to misleadingly create the impression that its Products are a safer and higher level of quality than they

---

[3] A summary of the results can be found here.
https://medium.com/@murialbezanson/paparazzi-jewelry-tests-positive-for-lead-and-nickel-877c2254a47d

are in reality, despite its knowledge that its Products did contain lead and nickel.

63.    In    particular,    Paparazzi    knows    that    wearing    accessories containing nickel is undesirable to many consumers because these materials can trigger adverse effects, such as allergic reactions and skin discoloration. Consumers also seek to avoid purchasing jewelry containing lead due to the toxic nature of the metal.

64.    Defendant's statements and omissions are especially material to parents and other customers who purchased Paparazzi's children's line of products, marketed as the Starlet Shimmer collection. The Starlet Shimmer collection was designed and marketed by Paparazzi to appeal to young children.




65.     Children who wore Paparazzi's Starlet Shimmer Products were unnecessarily put at risk of suffering the above-described adverse effects, as well as serious risk to their health. Nickel and lead pose even more harm if children mouth, chew or swallow these materials.

66.     Defendant's express representations that its Products were free from lead and nickel are important to reasonable consumers, such as Plaintiffs and Class Members, when purchasing the Products.

67.     Defendant conceals, suppresses or omits the fact that its Products contain lead and nickel. These facts are material because Defendant knows, or should know, that consumers, including Plaintiffs and proposed Class Members, rely on this information to evaluate the product.

68.     As a direct and proximate result of Defendant's advertising, marketing, and public statements, consumers, including Plaintiffs, purchased Paparazzi's Products for their personal use.

69.     Consumers pay the price they do—and Plaintiffs paid the price they did—because they reasonably believe that Paparazzi's Products, which are represented as being free of lead and nickel will not contain these materials.

70.     As alleged herein, Plaintiffs and proposed Class Members received something worth less than what they paid for and did not receive the benefit

of their bargain. They paid for the Products, which were supposed to be free of lead and nickel but did not receive such Products.

71.    Defendant knew or should have known of that its Products contained lead and nickel and have undertaken a deliberate and willful pattern of conduct, including taking affirmative measures, aimed at deceiving consumers, including Plaintiffs and proposed Class Members, into believing that the Products are free of these materials which are shown to cause adverse effects and are of a lesser quality than other materials used to make jewelry.

72.    At all relevant times, Defendant knew the true nature of the materials contained in the Products, but nevertheless marketed, advertised and sold the Products without disclosing this material information in an effort to persuade consumers that they were, in fact, buying Products that were free of lead and nickel.

73.    No reasonable consumer would expect that a product marketed as free of lead and nickel would contain these materials.

74.    As a direct and proximate result of Defendant's concealment of the presence of lead, nickel and its deceptive representations, Plaintiffs and other similarly situated consumers purchased and used the Products.

75.    Plaintiffs and all proposed Class Members purchased the Products which contained the same materials at the point of sale to the public.

76.    Paparazzi's false statements and misrepresentations are intentional, or otherwise entirely careless, and render its Products worthless or less valuable. If Defendant had disclosed to Plaintiffs and proposed Class Members that its Products contained lead and nickel. Each of these representations are important to reasonable consumers, such as Plaintiffs and proposed Class Members, when purchasing the Products.

77.    Plaintiffs and all proposed Class Members purchased the Products which contained the same chemicals at the point of sale to the public.

78.    Plaintiffs and each of the proposed Class Members have been damaged and suffered an injury in fact caused by Defendant's false, fraudulent, unfair, deceptive, and misleading practices, as set forth herein, and seek compensatory damages and such other and further relief as this Court deems just and proper.

79.    Prior to filing suit, Plaintiffs' counsel sent notice via Certified U.S. Mail to Defendant on behalf of certain Plaintiffs and others who purchased the Products, and put Paparazzi on notice that, contrary to its marketing, the Products contain lead and nickel. Counsel for Paparazzi acknowledged receipt but has failed to otherwise respond to Plaintiffs' allegations.

**F. Defendant's Knowledge**

80.    Defendant knows what materials are in its Products. In addition to testing its Products, Paparazzi's founders boast that they engage in "hands-

on leadership" of the company, and that they "individually design and source materials for Paparazzi products while working directly with manufacturing partners."

81.    Defendant are aware that many people shy away from purchasing low-cost jewelry, commonly referred to as costume jewelry, because they develop rashes, bumps or discolored skin after wearing such products. In particular, Defendant, in its position as a designer, importer, and seller, knows that nickel is widely known to cause such adverse effects.

82.    Moreover, Defendant's representations and the facts Defendant conceal, suppress or omit about the contents of its Products are material because Defendant knows that its Products contain lead and nickel in amounts far greater than what is considered to be trace amounts of these materials.

## G. TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

83.    Defendant has actual knowledge that its Products contain lead and nickel.

84.    Although Defendant was aware of the deception in its marketing, advertising, and sale of the Products, given the inclusion of lead and nickel in its Products, Paparazzi failed to disclose to Plaintiffs or proposed Class Members the lead and nickel contained in its Products.

85.     Despite its knowledge, Defendant has fraudulently concealed the fact that its Products contain lead and nickel. Defendant had a duty to disclose the existence of the lead and nickel.

86.     Defendant made, and continues to make, affirmative false statements and misrepresentations to consumers, to promote sales of its Products.

87.     Defendant concealed material facts that would have been important to Plaintiffs and proposed Class Members in deciding whether to purchase the Products. Defendant's concealment was knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiffs and proposed Class Members. Accordingly, Plaintiffs and proposed Class Members reasonably relied upon Defendant's concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

88.     The lead and nickel in the Products were not reasonably detectible to Plaintiffs and Class Members.

89.     At all times, Defendant actively and intentionally concealed the existence of the lead and nickel and failed to inform Plaintiffs or proposed Class Members of the existence of the lead and nickel in the Products. Accordingly, Plaintiffs' and proposed Class Members' lack of awareness was not attributable to a lack of diligence on their part.

90.     Defendant's statements, words, and acts were made for the purpose of suppressing the truth that the Products contained lead and nickel.

91.     Defendant concealed the lead and nickel for the purpose of delaying Plaintiffs and proposed Class Members from filing a complaint on their causes of action.

92.     As a result of Defendant's active concealment of the lead and nickel, and/or failure to inform Plaintiffs and proposed Class Members of the lead and nickel, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendant is estopped from relying on any statutes of limitations in light of its active concealment of the materials in its Products.

93.     Further, the causes of action alleged herein did not occur until Plaintiffs and proposed Class Members discovered that the Products contained Lead and nickel. Plaintiffs and proposed Class Members had no realistic ability to discern that the Products contained lead and nickel until they learned of the presence of these materials. In either event, Plaintiffs and proposed Class Members were hampered in their ability to discover their causes of action because of Defendant's active concealment of the presence of lead and nickel in its Products.

## H. <u>FED. R. CIV. P. 9(b) ALLEGATIONS</u>

94.    Although Defendant is in the best position to know what content it placed on its website(s), social media sites, and in marketing materials during the relevant timeframe, and the knowledge it had regarding the lead and nickel and its failure to disclose the existence of lead and nickel in its Products to Plaintiffs and consumers, to the extent necessary, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

95.    **WHO**: Defendant made false statements and material misrepresentations and/or omissions of fact on its website(s), marketing materials and in public statements, which include express and/or implicit representations that its Products were and are free of lead and nickel.

96.    **WHAT**: Defendant falsely and misleadingly represented that its Products were and are free of lead and nickel and failed to disclose that the Products contain these materials. Thus, Defendant's conduct deceived Plaintiffs and proposed Class Members into believing that the Products were manufactured and sold with such qualities. Defendant knew or should have known this information is material to reasonable consumers, including Plaintiffs and proposed Class Members in making their purchasing decisions, yet it continued to pervasively market the Products as possessing qualities they do not.

97.  **WHEN**: Defendant made material misrepresentations, false statements and/or omissions during the proposed Class and at the time Plaintiffs and proposed Class Members purchased the Products, prior to and at the time Plaintiffs and proposed Class Members made claims after realizing the Products contained lead and nickel and continuously throughout the applicable Class period.

98.  **WHERE**: Defendant's marketing message was uniform and pervasive, carried through material misrepresentations, false statements and/or omissions on its website(s), marketing materials and in public comments.

99.  **HOW**: Defendant made material misrepresentations, false statements and/or omissions regarding the presence of lead and nickel in its Products by making express and/or implicit representations in various marketing materials that its Products were free of lead and nickel and by omitting any facts in its marketing and/or other descriptions of its Products that would inform a consumer as to the presence of lead and nickel.

100.  **WHY**: Defendant made the material misrepresentations, false statements, and/or omissions detailed herein for the express purpose of inducing Plaintiffs, proposed Class Members, and all other reasonable consumers to purchase and/or pay for the Products instead of other brands that

did not make similar representations, the effect of which was that Defendant profited by selling the Products to many thousands of consumers.

101.    **INJURY**: Plaintiffs and proposed Class Members did not receive the benefit of their bargain.  They purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have, absent Defendant's misrepresentations, false statements and/or omissions.

## I. Facts Relating to Named Plaintiffs

i.    *Plaintiff Crystal Johnson*

102.    From approximately 2013 until early 2022, Plaintiff Crystal Johnson purchased Paparazzi's Products.

103.    The Products Ms. Johnson purchased were primarily made of metal, or had a metal base.

104.    Prior to purchasing Paparazzi's Products, and throughout the entire period in which she purchased these Products, Ms. Johnson viewed and relied on online marketing that contained the representation that Paparazzi's Products were lead and nickel free. This marketing included Paparazzi's consultants' social media, consultants' personal websites for selling Paparazzi Products, and online demonstrations and jewelry shows.

105.    Based on Paparazzi's representations, Ms. Johnson reasonably believed that Paparazzi's Products were lead and nickel free.

106.    Ms. Johnson purchased Paparazzi's Products because she was seeking jewelry was lead and nickel free.

107.    In making her purchases, Ms. Johnson specifically relied on Paparazzi's representations that its Products were lead and nickel free.

108.    In early 2022, Ms. Johnson learned that Paparazzi's Products were not lead and nickel free as advertised.

109.    When Ms. Johnson learned that Paparazzi's Products were not lead and nickel free, she stopped purchasing Paparazzi's Products.

110.    Ms. Johnson did not receive the benefit of her bargain when she purchased Paparazzi's Products that failed to conform to Paparazzi's material representations about its Products.

111.    Had she been aware of the false statements, misrepresentations, and omissions regarding the materials present in the Products, Ms. Johnson would not have purchased Paparazzi's products.

ii.    *Plaintiff Nancy Kebort*

112.    Beginning in 2020 and continuing through approximately early 2022, Plaintiff Nancy Kebort purchased Paparazzi's Products.

113.    The Products Ms. Kebort purchased were made of metal, or had a metal base.

114.    Prior to purchasing Paparazzi's Products, and throughout the entire period in which she purchased these Products, Ms. Kebort viewed and

relied on online marketing that contained the representation that Paparazzi's Products were lead and nickel free. This marketing included social media, consultants' personal websites for selling Paparazzi Products, and online demonstrations and jewelry shows.

115.    Ms. Kebort also viewed Paparazzi's description of the materials in its Products on social media, consultants' personal websites for selling Paparazzi Products, and online demonstrations and jewelry shows, in which Paparazzi described the metals in the Products as being free of lead and nickel.

116.    Based on Paparazzi's representations, Ms. Kebort reasonably believed that Paparazzi's Products were lead and nickel free.

117.    Ms. Kebort purchased Paparazzi's Products because she was seeking jewelry and accessories that were lead and nickel free.

118.    In making her purchases, Ms. Kebort specifically relied on Paparazzi's representations that its Products were lead and nickel free.

119.    In or around early 2022, Ms. Kebort learned that Paparazzi's Products were not lead and nickel free as advertised.

120.    When Ms. Kebort learned that Paparazzi's Products were not lead and nickel free, she stopped purchasing Paparazzi's Products.

121.    Ms. Kebort did not receive the benefit of her bargain when she purchased Paparazzi's Products that failed to conform to Paparazzi's material representations about its Products.

122.   Had she been aware of the false statements, misrepresentations, and omissions regarding the materials present in the Products, Ms. Kebort would not have purchased Paparazzi's products.

iii.   *Plaintiff Karen Langston*

123.   For approximately five (5) years, ending in early 2022, Plaintiff Karen Langston purchased Paparazzi's Products.

124.   The Products Ms. Langston purchased were made of metal, or had a metal base.

125.   Prior to purchasing Paparazzi's Products, and throughout the entire period in which she purchased these Products, Ms. Langston viewed and relied on online marketing that contained the representation that Paparazzi's Products were lead and nickel free. This marketing included Paparazzi's consultants' social media, consultants' personal websites for selling Paparazzi Products, and online demonstrations and jewelry shows.

126.   The websites maintained by Paparazzi's consultants contained various representations about the jewelry being "lead and nickel free."

127.   Additionally, Ms. Langston reviewed Paparazzi's website, where she sought out information regarding the Products' materials.

128.   Based on Paparazzi's representations, Ms. Langston reasonably believed that Paparazzi's Products were lead and nickel free.

129.   Ms. Langston purchased Paparazzi's Products because she was seeking jewelry and accessories that were lead and nickel free.

130.   In making her purchases, Ms. Langston specifically relied on Paparazzi's representations that its Products were lead and nickel free.

131.   In or around early 2022, Ms. Langston learned that Paparazzi's Products were not lead and nickel free as advertised.

132.   When Ms. Langston learned that Paparazzi's Products were not lead and nickel free, she stopped purchasing and wearing Paparazzi's Products.

133.   Ms. Langston did not receive the benefit of her bargain when she purchased Paparazzi's Products that failed to conform to Paparazzi's material representations about its Products.

134.   Had she been aware of the false statements, misrepresentations, and omissions regarding the materials present in the Products, Ms. Langston would not have purchased Paparazzi's products.

   iv.   *Plaintiff Pamela Sheehan-Peterson*

135.   For approximately two to three years, ending in 2022, Ms. Sheehan-Peterson has regularly purchased Paparazzi's Products, including a variety of children's jewelry.

136.   The Products Ms. Sheehan-Peterson purchased were primarily made of metal, or had a metal base.

137.    Prior to purchasing Paparazzi's Products, and throughout the entire period in which she purchased these Products, Ms. Sheehan-Peterson viewed and relied on online marketing that contained the representation that Paparazzi's Products were lead and nickel free. This marketing included Paparazzi's consultants' social media, consultants' personal websites for selling Paparazzi Products, and online demonstrations and jewelry shows. Each of the Paparazzi's consultant's website that she visited contained the same representations about the Products being lead and nickel free.

138.    Based on Paparazzi's representations, Ms. Sheehan-Peterson reasonably believed that Paparazzi's Products were lead and nickel free.

139.    Ms. Sheehan-Peterson purchased Paparazzi's Products for herself and others because she was seeking jewelry and accessories that were lead and nickel free.

140.    In making her purchases, Ms. Sheehan-Peterson specifically relied on Paparazzi's representations that its Products were lead and nickel free.

141.    In or around early 2022, Ms. Sheehan-Peterson learned that Paparazzi's Products were not lead and nickel free as advertised.

142.    When Ms. Sheehan-Peterson learned that Paparazzi's Products were not lead and nickel free, she stopped purchasing Paparazzi's Products.

143.    Ms. Sheehan-Peterson did not receive the benefit of her bargain when she purchased Paparazzi's Products that failed to conform to Paparazzi's material representations about its Products.

144.    Had Sheehan-Peterson been aware of the false statements, misrepresentations, and omissions regarding the materials present in the Products, she would not have purchased Paparazzi's Products.

v.    *Plaintiff Leslie Ann Williams*

145.    For approximately four (4) years, ending in 2022, Ms. Leslie Ann Williams purchased Paparazzi's Products.

146.    The Products Ms. Williams purchased were made of metal, or had a metal base.

147.    Prior to purchasing Paparazzi's Products, and throughout the entire period in which she purchased these Products, Ms. Williams viewed and relied on online marketing that contained the representation that Paparazzi's Products were lead and nickel free. This marketing included Paparazzi's consultants' social media, consultants' personal websites for selling Paparazzi Products, and online demonstrations and jewelry shows.

148.    Based on Paparazzi's representations, Ms. Williams reasonably believed that Paparazzi's Products were lead and nickel free.

149.    Ms. Williams purchased Paparazzi's Products because she was seeking jewelry and accessories that were lead and nickel free.

150.    In making her purchases, Ms. Williams specifically relied on Paparazzi's representations that its Products were lead and nickel free.

151.    In early 2022, Ms. Williams learned that Paparazzi's Products were not lead and nickel free as advertised.

152.    When Ms. Williams learned that Paparazzi's Products were not lead and nickel free, she stopped purchasing.

153.    Ms. Williams did not receive the benefit of her bargain when she purchased Paparazzi's Products that failed to conform to Paparazzi's material representations about its Products.

154.    Had she been aware of the false statements, misrepresentations, and omissions regarding the materials present in the Products, Ms. Williams would not have purchased Paparazzi's products.

## J. CLASS ACTION ALLEGATIONS

155.    Plaintiffs bring this action individually and as representatives of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of themselves and the members of the following class ("Nationwide Class"):

> **During the fullest period allowed by law, all persons who purchased any of Paparazzi's Products in the United States for personal use and not for resale.**

156.    Plaintiffs Crystal Johnson, Nancy Kebort, Karen Langston, Pamela Sheehan-Peterson, and Leslie Ann Williams bring this action individually and as representatives of all those similarly situated, pursuant to

Fed. R. Civ. P. 23, on behalf of themselves and the members of the following class ("North Carolina Subclass"):

**During the fullest period allowed by law, all persons who purchased any of Paparazzi's Products in North Carolina for personal use and not for resale.**

157.    Specifically excluded from these definitions are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel. Plaintiffs reserve the right to amend the Class definition as necessary.

158.    <u>Numerosity</u>: The Members of the proposed Class are so numerous that joinder of all members is impracticable. While the exact number of the proposed Class Members is presently unknown, it likely consists of at least thousands of people throughout the United States, as well as in the State North Carolina. The number of proposed Class Members can be determined by sales information and other records. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity. The proposed Class is readily identifiable from information and records in the possession of Defendant.

159.    <u>Typicality</u>: The claims of the representative Plaintiffs are typical in that Plaintiffs, like all proposed Class Members, purchased the Products

that were manufactured, marketed, advertised, distributed, and sold by Defendant. Plaintiffs, like all proposed Class Members, have been damaged by Defendant's misconduct in that, *inter alia*, they have incurred or will continue to incur damage as a result of not receiving the benefit of their bargain by paying and/or overpaying for a product containing lead and nickel. Furthermore, the factual basis of Defendant's misconduct is common to all proposed Class Members because Defendant has engaged in systematic deceptive and fraudulent behavior that was deliberate, includes negligent misconduct, and results in the same injury to all proposed Class Members.

160.   <u>Commonality</u>: Common questions of law and fact exist as to all proposed Members of the Class. These questions predominate over questions that may affect only individual proposed Class Members because Defendant has acted on grounds generally applicable to the proposed Class. Such common legal or factual questions include, *inter alia*:

(a)   Whether the Products contain lead and nickel;

(b)   Whether Defendant's practices in marketing the Products tend to mislead reasonable consumers into believing that Paparazzi's Products do not contain lead and nickel;

(c)   Whether Defendant omitted or failed to disclose material information to Plaintiffs and proposed Class Members regarding its Products;

(d)   Whether Defendant concealed from and/or failed to disclose to

Plaintiffs and proposed Class Members that the Products contained lead and nickel;

(e)    Whether Defendant breached express warranties relating to the Products;

(f)    Whether Defendant breached the implied warranty of merchantability relating to the Products;

(g)    Whether Defendant engaged in unfair, unconscionable, or deceptive trade practices by selling and/or marketing the Products containing lead and nickel;

(h)    Whether Defendant engaged in false or misleading advertising by selling and/or marketing the Products containing lead and nickel;

(i)    Whether Plaintiffs and proposed Class Members either paid a premium for the Products that they would not have paid but for Defendant's false, deceptive and unfair marketing and sale of its Products or would not have purchased them at all;

(j)    Whether Plaintiffs and proposed Class Members are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

(k)    Whether Plaintiffs and proposed Class Members have been injured and the proper measure of their losses as a result of those injuries; and

(l)    Whether Plaintiffs and proposed Class Members are entitled to

injunctive, declaratory, or other equitable relief.

161.   <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of the proposed Class Members. They have no interests antagonistic to those of the proposed Class Members. Plaintiffs retained attorneys experienced in the prosecution of class actions, including, *inter alia*, consumer products, misrepresentation, and mislabeling class actions, and Plaintiffs intend to prosecute this action vigorously.

162.   <u>Predominance and Superiority</u>: Plaintiffs and proposed Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, proposed Class Members would likely find the cost of litigating their claims prohibitively high given the average price point of Paparazzi's  Products and would therefore have no effective remedy at law. Because of the relatively small size of proposed Class Members' individual claims, it is likely that few of the proposed Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, proposed Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal

litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

163.    Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

164.    Defendant has acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class appropriate.

## COUNT I
## Breach of Express Warranty
### (On Behalf of Plaintiffs and the Classes)

165.    Plaintiffs, individually and on behalf of the Classes, bring this cause of action and hereby adopt and incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

166.    Defendant manufactures markets, advertises, distributes, and sells its Products as part of its regular course of business.

167.    Defendant is, and was at all relevant times, a "merchant" under U.C.C. § 2-313, and State U.C.C. provisions.

168.    Until at least December 2021, in connection with its advertisement and sale of the Products, Defendant expressly represented and warranted that its Products were free of lead and nickel.

169.   Defendant's pervasive marketing campaign includes the warranty representations described herein, which are made on Paparazzi's websites, social media accounts, as well as in product specifications and Defendant's statements to the public.

170.   These representations are affirmations of fact and promises that the Products were free of lead and nickel.

171.   Defendant made these express representations and warranties to all consumers, including Plaintiffs and Class Members.

172.   Plaintiffs and Class Members purchased the Products from Defendant.

173.   Defendant's foregoing express representations and warranties are the basis of the bargain between Plaintiffs, Class Members and Defendant.

174.   The express written warranties covering the Products are a material part of the bargain between Defendant and consumers. When making these express warranties, Defendant knows that reasonable consumers purchase the Products because they believe these products to be as marketed.

175.   As designer, manufacturer, marketer, advertiser, distributer and seller of the Products, Defendant had knowledge and notice that the Products contained lead and nickel, which was unknown to consumers at the time of sale.

176.    Defendant breached the foregoing express warranties by placing the Products into the stream of commerce and selling them to consumers when, despite Defendant's representations to the contrary, the Products contained lead and nickel and were therefore not free of these materials, as promised in Defendant's marketing and public comments.

177.    Defendant further breached its express written warranties in that the Products contained lead and nickel on the first day of purchase and by failing to disclose and actively concealing this information, and therefore the unwanted risk of the adverse effects associated with these materials, from consumers.

178.    Defendant further breach its warranties because it fails or refuses to adequately replace the Products with products that are actually as represented, despite its knowledge that its Products contain lead and nickel and/or despite its knowledge of alternative formulations, designs, materials, and/or options for manufacturing the Products without lead and nickel.

179.    It is reasonably foreseeable that Plaintiffs and Class Members are the intended beneficiaries of the Products and warranties, creating privity or an exception to any privity requirement. Plaintiffs and each of the Class Members are the intended beneficiaries of Defendant's warranties and the sale of the Products through Defendant's consultants. The consultants are not intended to be the ultimate consumers of the Products and have no rights

under the warranty agreements provided by Defendant. Defendant's warranties are designed for and intended to benefit the consumer only, and Plaintiffs and Class Members are the intended beneficiaries of the Products.

180.    Defendant has been provided sufficient notice of its breaches of the express warranties associated with the Products.

181.    Defendant received further notice and has been on notice of its breach of warranties through its sale of the Products, its own testing, and online reports about independent third-party testing of its Products.

182.    The presence of lead and nickel render the Products unfit for their intended use and purpose and substantially impair the use and value of the Products.

183.    Plaintiffs and Class Members purchased the Products, which were not lead and nickel free, as promised by Defendant. Instead, they received products that contained lead and/or nickel. As a result, Plaintiffs and Class Members suffered a loss of the product, loss of use of the product, loss of the product's intended benefits, and loss of the benefit of their bargain.

184.    Plaintiffs and Class Members were injured as a direct and proximate result of Defendant's breaches of warranties because they would not have purchased the Products, or paid less, if the true facts had been known. Specifically, Plaintiffs and Class Members suffered economic damages at the point-of-sale in connection with their payment/overpayment for the Products,

as well as the loss of the Products' intended benefits, which include avoiding exposure to unwanted risk of adverse effects.

185.    Accordingly, Plaintiffs and Class Members are entitled to legal and equitable relief including compensatory damages, costs, attorneys' fees, rescission, and all such other relief deemed appropriate, for an amount to compensate them for not receiving the benefit of their bargain, as well as any additional relief the Court deems proper.

## COUNT II
## Breach of Implied Warranty
### (On Behalf of Plaintiffs and the Classes)

186.    Plaintiffs, individually and on behalf of the Classes, bring this cause of action and hereby adopt and incorporate by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

187.    Defendant is a merchant and, at all relevant times, has been involved in the manufacturing, distributing, warranting, and/or selling of the Products.

188.    The Products are goods as defined by U.C.C. § 2-105, and State U.C.C. provisions and Defendant knows or has reason to know of the specific use for which the Products, as goods, are purchased.

189.    The implied warranty of merchantability included with the sale of each Product means that Defendant warrants that the Products are fit for the ordinary purposes for which the Products are used and sold, and are not

otherwise injurious to consumers, that the Products would pass without objection in the trade, be of fair and average quality, and conform to Defendant's promises and affirmations of fact. This implied warranty of merchantability is part of the basis for the benefit of the bargain between Defendant and consumers, which include Plaintiffs and Class Members.

190.    Defendant breached the implied warranty of merchantability because the Products are not fit for their ordinary purpose of providing Products that are free of lead and nickel.

191.    Defendant's warranty applies to the original purchaser and any succeeding owner of the Products, creating privity between Defendant and Plaintiffs and Class Members.

192.    Notwithstanding, privity is not required because Plaintiffs and Class Members are the intended beneficiaries of Defendant's warranties. Defendant's consultants are not intended to be the ultimate consumers of the Products and have no rights under the warranty agreements. Defendant's warranties are designed for and intended to benefit the consumer only and Plaintiffs and Class Members are their intended beneficiaries.

193.    More specifically, Defendant's intention that their warranties apply to Plaintiffs and Class Members is evident from the statements contained in their marketing and public comments. Likewise, it is reasonably

foreseeable that Plaintiffs and Class Members would be the intended beneficiaries of the Products and warranties.

194. Defendant impliedly warrant that the Products are of merchantable quality and fit for such use. These implied warranties include, inter alia: (i) a warranty that the Products, which are designed, manufactured, supplied, distributed, and/or sold by Defendant, are free of lead and nickel.

195. Contrary to the applicable implied warranties, the Products, at the time of sale and thereafter, are not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members. Instead, the Products suffered, and continues to suffer, from a formulation, design and/or manufacture defect, as alleged herein.

196. Defendant's failure to adequately repair or replace the Products cause the warranty to fail of its essential purpose.

197. Defendant breached its implied warranties because the Products are sold with lead and nickel.

198. As a direct and proximate result of the foregoing, Plaintiffs and Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law, as well as any additional relief the Court deems proper.

## COUNT III

### Violation of the North Carolina Unfair and Deceptive Trade Practices Act,
### G.S. § 75-1.1, et seq.
### (On Behalf of the North Carolina Subclass)

199.    Plaintiffs, individually and on behalf of the North Carolina Subclass, bring this cause of action and hereby adopt and incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

200.    Defendant engaged in commerce, as that term is defined by N.C. Gen. Stat. § 75-1.1.

201.    Defendant's false marketing and sale of its Products as free of lead and nickel when its Products contained these materials had the capacity or tendency to deceive consumers and did indeed deceive Plaintiffs and members of the North Carolina Subclass.

202.    The presence of lead and nickel in the Products is material information to consumers like Plaintiffs and the subclass. Defendant falsely and/or misleadingly represented this material information knowingly, willfully, wantonly, and with reckless disregard for the truth.

203.    Plaintiffs and the Subclass were induced to purchase the Products by Defendant's marketing, to which all consumers were exposed. Plaintiffs and the Subclass have been injured as a result of their reliance on Defendant's deceptive marketing and sales practices.

204.    Pursuant to the North Carolina Unfair and Deceptive Trade Practices Act, Plaintiffs and the North Carolina Subclass seek declaratory relief, full refund, actual and punitive damages, statutory damages, and attorneys' fees.

## COUNT IV
## Negligent Misrepresentation
## (On Behalf of Plaintiffs and the Classes)

205.    Plaintiffs, individually and on behalf of the Classes, bring this cause of action and hereby adopt and incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

206.    As a merchant and seller of the Products, Defendants has a duty to give true and accurate information to Plaintiffs and Class Members regarding the materials contained in its Products.

207.    Defendant has sole possession and control of this information.

208.    Defendant represented that its Products were lead and nickel free, when in reality, testing has shown that the Products contain lead and/or nickel.

209.    Defendant knows, or should know, that its Products contain lead and nickel.

210.    Defendant supplies the information that the Products are free of lead and nickel, qualities known by Defendant to be material to and desired by consumers, including Plaintiffs and Class Members.  Defendant knows that these representations will, and did, induce customers to purchase its Products instead of other competitors' products.

211.    Plaintiffs and Class Members relied upon Defendant's representations that its Products are lead and nickel free when purchasing the Products. Further, this reliance was in fact to their detriment because the Plaintiffs and Class Members purchased the Products which contain lead and nickel.

212.    Plaintiffs and Class Members are entitled to all relief the Court deems proper as a result of Defendants' actions described herein.

## COUNT V
### (In the Alternative)
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Classes)

213.    Plaintiffs, individually and on behalf of the Classes, bring this cause of action and hereby adopt and incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

214.    Plaintiffs and Class Members conferred a monetary benefit on Defendant, and Defendant had knowledge of this benefit. The retail price for Defendant's Products is $5.00.

215.    By its wrongful acts and omissions described herein, including advertising and selling the Products as lead and nickel free when, in fact, these materials were present in the Products, Defendant has been unjustly enriched at the expense of Plaintiffs and Class Members.

216.    Plaintiffs' and Class Members' detriment and Defendant's enrichment are related to and flow from the wrongful conduct alleged herein.

217.    Defendant has profited from its unlawful, misleading, and deceptive practices at the expense of Plaintiffs and Class Members under circumstances in which it would be inequitable for Defendant to retain the profits, benefits, and other compensation obtained from its wrongful conduct as described herein in connection with the advertisement and sale of its Products.

218. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's unjust enrichment because they would not have purchased the Products at all, on the same terms or for the same price had they known that the Products contained lead and nickel.

219. Defendant either knows or should know that payments rendered by Plaintiffs and Class Members are given and received with the expectation that its Products are free of lead and nickel and capable of providing the benefits associated with jewelry that is free of these materials. It is inequitable for Defendant to retain the benefit of Class Members' payments in these circumstances.

220. Plaintiffs and Class Members seek restitution from Defendant and an order of this Court to proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct and establishing a constructive trust from which Plaintiffs and Class Members may seek restitution.

221. When required, Plaintiffs and Class Members are in privity with Defendant because Defendant's sale of the Products was through authorized third-party sellers. Purchases through authorized third-party sellers is sufficient to create such privity because such authorized third parties are Defendant's agents for the purpose of the sale of Defendant's Products.

222.    As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiffs and Class Members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendant for its inequitable and unlawful conduct.

**COUNT VI**
**(In the Alternative)**
**Violation of NC Gen Stat § 25-2-313**
**North Carolina's Breach of Express Warranty Statute**
**(On Behalf of the North Carolina Subclass)**

223.    Plaintiffs, individually and on behalf of the North Carolina Subclass, bring this cause of action and hereby adopt and incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

224.    Defendant manufactures markets, advertises, distributes, and sells its Products as part of its regular course of business.

225.    Defendant is, and was at all relevant times, a "merchant" under U.C.C. § 2-313, and related State U.C.C. provisions.

226.    In connection with its advertisement and sale of the Products, Defendant expressly represented and warranted that its Products were free of lead and nickel.

227.    Defendant's pervasive marketing campaign includes the warranty representations described herein, which are made on Paparazzi's websites,

social media accounts, as well as in product specifications and Defendant's statements to the public.

228.    These representations are affirmations of fact and promises that the Products are  free of lead and nickel.

229.    Defendant made these express representations and warranties to all consumers, including Plaintiffs and Class Members.

230.    Plaintiffs and Class Members purchased the Products from Defendant.

231.    Defendant's foregoing express representations and warranties are the basis of the bargain between Plaintiffs, Class Members and Defendant.

232.    The express written warranties covering the Products are a material part of the bargain between Defendant and consumers. When making these express warranties, Defendant knows that reasonable consumers purchase the Products because they believe these products to be as marketed.

233.    As designer, manufacturer, marketer, advertiser, distributer and seller of the Products, Defendant has knowledge and notice that the Products contain lead and nickel, which was unknown to consumers at the time of sale.

234.    Defendant breached the foregoing express warranties by placing the Products into the stream of commerce and selling them to consumers when, despite Defendant's representations to the contrary, the Products contain lead

and nickel and are therefore not free of these materials, as promised in Defendant's marketing and public comments.

235.    Defendant further breached its express written warranties in that the Products contain lead and nickel on the first day of purchase and by failing to disclose and actively concealing this information, and therefore the unwanted risk of the adverse effects associated with these materials, from consumers.

236.    Defendant further breach its warranties because it fails or refuses to adequately replace the Products with products that are actually as represented, despite their knowledge that their products contain lead and nickel and/or despite their knowledge of alternative formulations, designs, materials, and/or options for manufacturing the Products without lead and nickel.

237.    It is reasonably foreseeable that Plaintiffs and Class Members are the intended beneficiaries of the Products and warranties, creating privity or an exception to any privity requirement. Plaintiffs and each of the Class Members are the intended beneficiaries of Defendant's warranties and the sale of the Products through Defendant's consultants. The consultants are not intended to be the ultimate consumers of the Products and have no rights under the warranty agreements provided by Defendant. Defendant's

warranties are designed for and intended to benefit the consumer only, and
Plaintiffs and Class Members are the intended beneficiaries of the Products.

238.    Defendant has been provided sufficient notice of its breaches of the
express warranties associated with the Products.

239.    Defendant received further notice and has been on notice of its
breach of warranties through its sale of the Products, its own testing, and
online reports about independent third-party testing of its Products.

240.    The presence of lead and nickel render the Products unfit for their
intended use and purpose and substantially impair the use and value of the
Products.

241.    Plaintiffs and Class Members purchased the Products that are not
lead and nickel free. Instead, they received products that contained lead and/or
nickel. As a result, Plaintiffs and Class Members suffered a loss of the product,
loss of use of the product, loss of the product's intended benefits, and loss of the
benefit of their bargain.

242.    Plaintiffs and Class Members were injured as a direct and
proximate result of Defendant's breaches of warranties because they would not
have purchased the Products, or paid less, if the true facts had been known.
Specifically, Plaintiffs and Class Members suffered economic damages at the
point-of-sale in connection with their payment/overpayment for the Products,

as well as the loss of the Products' intended benefits, which include avoiding exposure to unwanted risk of adverse effects.

243.    Accordingly, Plaintiffs and Class Members are entitled to legal and equitable relief including compensatory damages, costs, attorneys' fees, rescission, and all such other relief deemed appropriate, for an amount to compensate them for not receiving the benefit of their bargain, as well as any additional relief the Court deems proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully requests that this Court:

A.    Certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Name Plaintiffs as Class Representatives of their respective Classes;

C.    Name Plaintiffs' counsel as Class Counsel for the Classes;

D.    Award damages, including compensatory, exemplary, and statutory damages, to Plaintiffs, the Class and Subclasses in an amount to be determined at trial;

E.    Permanently enjoin Defendant from engaging in the wrongful and unlawful conduct alleged herein;

F.    Award Plaintiffs and the Classes their expenses and costs of suit,

including reasonable attorneys' fees to the extent provided by law;

G.    Award Plaintiffs, the Classes pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

H.    Award such further relief as the Court deems appropriate.

## **JURY TRIAL DEMANDED**

Plaintiffs, individually and on behalf of all others similarly situated, respectfully demand a trial by jury on all claims so triable.

Dated: April 29, 2022                    Respectfully submitted,

MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN LLP

/s/ *Patrick M. Wallace*
Patrick Wallace
N.C. State Bar No. 48138
900 W. Morgan Street
Raleigh, NC 27603
P.O. Box 12638
Raleigh, NC 27605
pwallace@milberg.com

MAGINNIS LAW, PLLC
Karl S. Gwaltney
N.C. State Bar No. 45118
4801 Glenwood Avenue, Ste. 310
Raleigh, NC 27612
Telephone: 919-526-0450
Fax: 919-882-8763
kgwaltney@maginnislaw.com

*Attorney for Plaintiffs and the Putative Class*